## EINSTEIN'S SONS *et al. v.* LEE *et al.*

1. Where the debtor sold his whole stock of goods for cash to another defendant some days before the petition of the creditors for injunction and receiver was filed, at a fair though somewhat reduced price, the sale being conducted without any concealment, the intention and repeated efforts to sell being widely known in the business community for some time prior to the sale, and the goods were removed publicly during business hours to the vendees' store where they remained for several days separate and apart from their other stock, there being no allegation or evidence that the vendees are insolvent and no appearance of collusion in the sale, and where there was no evidence at all of fraud in the conveyance by the debtor of certain real estate to his wife, the conveyance having been made long before the indebtedness was contracted and, so far as appears, not in anticipation thereof, it does not appear that there was any abuse of distion on the preliminary hearing in refusing to grant an injunction and appoint a receiver.
2. The Supreme Court will not reverse a refusal of the presiding judge to punish for contempt in disobeying an order to surrender property to a temporary receiver, where, after hearing both parties, the judge rightly determines that the case is one in which

there ought to be no receiver and therefore refuses the application for injunction and the appointment of a permanent receiver. March 26, 1892. Argued at the last term.          *Judgment affirmed.*

Injunction and receiver. Debtor and creditor. Contempt. Before Judge ROBERTS. Dodge county. At chambers, December 5, 1891.

The exceptions are, (1) to the denial of an injunction and a receiver, and (2) to the dismissal of the proceedings for contempt against two of the defendants. The petition was in behalf of six parties, creditors of J. W. Lee by notes and accounts in various amounts aggregating over fifteen hundred dollars. It was presented on October 24, 1891, and showed that most of the indebtedness referred to was contracted in 1891 and became due in October. It was further alleged that for several years past Lee has been a trader or retail merchant in Eastman, and his indebtedness to petitioners, who are wholesale merchants and dealers, is for goods sold by them to him for the purpose of being sold by him to his customers at retail in the regular course of trade as a retail merchant, and the goods were placed by him in his store at Eastman for that and no other purpose, and to be disposed of in no other manner would petitioners have sold them to him on credit as shown by the notes and accounts exhibited. Instead of continuing in his business as a retail merchant and selling said goods at retail in the regular course of trade as was contemplated by the parties at the time of the purchase of the goods, Lee about the first or second of October, just as some of his indebtedness became due and before some of it was due, sold at wholesale for cash to S. Herrman, Bro. & Co., who also are retail merchants in Eastman, his entire stock of merchandise including the goods sold to him by petitioners, as well as the goods he had bought from other wholesale merchants and not paid for, said sale being made quietly

and secretly and without knowledge of petitioners or other creditors of Lee, and being at a discount of forty per cent. from the wholesale price at which the goods were sold to him by petitioners and his other creditors; and thus he has sold and converted his entire visible property liable to the payment of his debts, into cash which he conceals and refuses to pay to petitioners and his other creditors, and has caused the title to all other real and personal property which he acquired while engaged in said mercantile business to be made to his wife in fraud of his creditors. On April 20, 1887, he purchased from Leitch & Morgan part of a certain lot of land to which he obtained a deed from them, and built thereon the house in which he now resides. On June 30, 1887, he conveyed said premises to the Amoskeag Lumber Co. for lumber purchased from it by him and used in the construction of the house; and on December 2, 1887, he paid the debt, but caused a deed to be made by that company to his wife in order to put the property beyond the reach of his creditors both existing and those who might afterwards become such, and thus to defraud them. On April 18, 1889, he purchased from L. M. Peacock one eighth of an acre of the same lot of land, adjoining the premises above referred to and now under the same enclosure, but for the like purpose of defrauding his creditors he caused the deed to be made to his wife. All of the acts heretofore mentioned were done by him for the purpose of avoiding the payment of his debts to petitioners and others; and in purchasing the stock of merchandise Herrman, Bro. & Co. knew that such was his intention, for, being themselves retail merchants, they well knew that no merchant of moderate means could sell his whole stock in trade at such discount without defrauding his creditors; and they also knew that it was upon their own recommendation that petitioners Einstein's Sons sold their

goods to Lee on credit, and thus Herrman, Bro. & Co. participated in the fraud·of Lee, for they paid only about $1,300 for the stock which was valued by them and by Lee at about $2,200, and they quickly removed the goods to their own store as soon as the sale was consummated. The stock so attempted to be sold, the money arising from said sale, and the real estate mentioned, are assets charged with the payment of debts due petitioners and other creditors ; and there is manifest danger of loss or material injury to petitioners and other creditors unless a receiver is appointed to take the assets and hold them subject to the direction of the court, for Lee is absolutely insolvent and has no other property and no source of revenue to meet his obligations; and there is no adequate remedy save by injunction and receiver and the exercise of equity powers whereby the assets may be reached and applied to the payment of his debts ; and pending the delay of litigation in any other manner the money realized by him from the sale of the stock of merchandise would be disposed of by him ; and the real estate might be sold to ·innocent purchasers by Mrs. Lee under his influence ; and Herrman, Bro. & Co. have already mingled the stock of merchandise with other similar goods in their store, so that it would be difficult if not impossible to identify them. The prayer is, for receiver to take possession of the stock of merchandise and the money arising from the sale of it, and hold the same subject to the direction of the court ; for judgment for the amounts of petitioners' debts ; for decree that the property be sold and applied thereto, and that the real estate be subject thereto, and that the sale to Herrman, Bro. & Co. is null and void; that they be required either to deliver the stock of merchandise to the receiver, or to pay him $880 which is the difference between the actual wholesale value of the stock and the price paid by them for it ;

that Lee be required to turn over to the receiver the money so paid, and be enjoined 'from otherwise disposing of it; that Mrs. Lee be enjoined from disposing of or encumbering the real estate; that, if the court deem it necessary, an attachment issue against Lee on the ground of his selling and concealing his property liable to the payment of his debts, for the purpose of avoiding such payment, and that this proceeding be used in aid of such attachment; and for general relief and process.

Attached are copies of the accounts and notes of petitioners, with affidavits verifying the petition. A restraining order was granted, and a temporary receiver appointed to take possession of the stock of merchandise and the money arising from the sale of it.

The defendants, Lee, Mrs. Lee and S. Herrman, Bro. & Co., demurred on various grounds, and made answers from which the following appears: About five years ago Lee commenced business in Eastman, and during said time has been engaged in various enterprises, some conducted by himself and some with partners. In the fall of 1888 he entered into partnership with Mrs. E. B. Milner, and under the firm name of J. W. Lee & Co. they conducted a mercantile business until about the first of January, 1890, when the partnership was dissolved, Lee retiring and selling his interest in the business to J. W. Taylor, with the agreement on the part of the purchasers, who assumed the name of Taylor & Milner, that they would pay all the obligations of the old firm, which defendants are informed were promptly paid. When Lee entered the partnership with Mrs. Milner he had a small capital in money, and did not owe a dollar to any man. On retiring from said business he commenced business in his own name about January 15, 1890, buying a stock of goods for which he paid cash. He was then out of debt and owned his stock of goods so purchased. He continued to run the business thus

commenced until the first or second of October, 1891, when he sold his stock of goods and fixtures to Herrman, Bro. & Co. for $1,345.96 cash, which was paid to him at that time and was a fair price for the stock and fixtures sold, considering their condition, etc. The sale was not for the purpose of defrauding his creditors; nor did Herrman, Bro. & Co. know that such was his object, or that he was indebted to petitioners, or that the goods they were buying had not been paid for, or that it was his purpose to convert his visible assets into cash, or that in making the sale he was engaged in a fraudulent scheme, or that petitioners would be hurt thereby. The sale was not quietly and secretly accomplished, nor was the price paid less than the true cash value of the goods, nor were they removed quietly as soon as the sale was consummated. The sale was made one day, stock taken and the store closed, and in the busiest part of the next day the goods were removed by Herrman, Bro. & Co. to their store where for several days they were kept separate and apart from the large stock of goods of Herrman, Bro. & Co., though since then they have been placed on the shelves and it would be impossible to identify them. Lee offered the goods to a number of different persons, making no secret of it; and he does not suppose there was a man in town, hardly, but knew of the trade, and that the stock was being taken for the purpose of closing the transaction. Herrman, Bro. & Co. had known him for many years. He went to them, as he did to several others, and offered to sell the entire stock, saying he desired to quit business. At first Herrman, Bro. & Co. did not want to purchase, and the sale was not accomplished until after considerable negotiation; and inasmuch as there was considerable old stock on hand, they did not and could not pay him what he had paid for the goods. The purchase was in absolute good faith and without notice of the alleged indebtedness or fraud-

ulent intention. Not all of the goods sold by petitioners to Lee were sold to Herrman, Bro. & Co.; on the contrary he sold, in the course of trade, large quantities of the goods purchased from petitioners; and it would be impossible to say how much of the purchases from petitioners were in the stock sold, or in what it consisted. Herrman, Bro. & Co. never recommended to Einstein's Sons that they sell Lee on a credit, nor participated in any of the alleged frauds of Lee. Herrman, Bro. & Co. are solvent and amply able to respond in a suit at law to any demands which petitioners may have against them. At the time of the purchase by Lee of the realty from Leitch & Morgan he had not married. He married shortly afterwards, built the house and gave it to his wife for a home, causing the Amoskeag Lumber Co. to execute a deed to her, he having previously conveyed the land to that company to secure a debt for material with which to build the house. He fully paid the debt, and denies that he caused the deed to be made to his wife in order to place the property beyond the reach of his creditors and thus defraud them, but avers that he gave her the premises because of love and affection. He was not then indebted to petitioners or any other person or persons, and did not become indebted until long after this gift. The purchase price of the land bought of Peacock was only $15. On the first of January, 1890, he arranged for the payment of all the debts he then owed, as heretofore stated, in the sale of his interest in the business of J. W. Lee & Co. The property aforesaid is all the property he has ever given to his wife, and was given to her when he was solvent, out of debt, and able to do so in law.

On November 14 the petitioners presented to the judge two other petitions in which they alleged that on the 24th of October the temporary receiver had demanded of Lee the money ($1,300) which had been paid

to him by Herrman, Bro. & Co., and of Herrman, Bro. & Co. the stock of merchandise sold to them by him, both of which demands were refused; and that on the 2d of November he had again made the same demands, which were again refused. Wherefore they prayed for an order to show cause why the defendants named should not be punished as for contempt of court. In answer to the rule *nisi* Lee swore that he was unable to make the surrender required in said order, "owing to the fact that the money arising from the sale of the stock of goods had been paid out upon *bona fide* debts prior to the filing of the bill by complainants, and not for the purpose of defrauding creditors, but simply to discharge valid subsisting debts, and it is not in his power, custody or control." Herrman, Bro. & Co. answered that it was impossible for them to turn over to the receiver the stock of goods referred to, because the goods so purchased of Lee remained to themselves in their store for several days during which time a good portion of them were sold, and having placed the remainder of them in stock with other goods and placing respondents' trademark upon them, prior to the filing of the bill by complainants, it was impossible to distinguish them from other goods in stock, there being at that time a large stock of goods in their store consisting of general merchandise, among which were a great many goods similar to the stock purchased from Lee.

By consent the entire case made by the petition, demurrers, pleas, answers, attachment proceedings and affidavits, was heard and determined together. Evidence was introduced by both sides. Its nature and effect is indicated by the foregoing statement of the pleadings. The first head-note states the controlling facts.

DeLacy & Bishop, for plaintiffs.

Smith & Clements and Herrman & Coffee, for defendants.